# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ANN TROWER**
           **Plaintiff,**

      **v.**                                    **Case No. 14-C-0917**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
                  **Defendant.**

---

## DECISION AND ORDER

Plaintiff Ann Trower applied for social security disability benefits based on a hip fracture, back pain, and fibromyalgia, but the Social Security Administration ("SSA") denied her claim initially and on reconsideration, as did an Administrative Law Judge ("ALJ") after a hearing. Plaintiff now seeks judicial review of the ALJ's decision, as allowed by 42 U.S.C. §§ 405(g) & 1383(c)(3).

## I.  FACTS AND BACKGROUND

Plaintiff alleged a disability onset date of February 4, 2010, and the agency accordingly collected her medical records back to January 2010.  I first review the substantial medical record before turning to the procedural history of the case.

### A.  Medical Evidence

On January 21, 2010, plaintiff saw Dr. Harry Tagalakis at Advanced Pain Management, complaining of low back pain radiating into the right lower extremity.  She described the pain as intermittent, 3/10 at best, 9/10 at worst.  She stated that the pain was aggravated by sitting, coughing, twisting, and walking, and relieved by ice and rest.  Plaintiff reported numbness and

weakness in her right lower extremity and indicated that the pain interfered with sleep and daily activities. She had tried chiropractic treatment, with mild improvement, and physical therapy, with no change. (Tr. at 386.) On exam, her gait was steady, she had mild tenderness over the lumbar spine and across the right buttock, and straight leg raise was positive on the left side at 30 degrees and on the right at 15 degrees.[1] (Tr. at 387.) An MRI dated December 15, 2009, showed small disc protrusions with annular tears at L3-L4 and L5-S1, mild disc bulging with annular tears at L4-L5, and mild disc bulging at T11-T12 (Tr. at 387-88). Dr. Tagalakis assessed lumbar radiculopathy, degeneration of lumbar discs, and facet arthropathy, scheduling a lumbar epidural injection. Plaintiff was at the time taking Norco[2] and Flexeril,[3] denied any side effects from the medications, and did not need refills. (Tr. at 388.) Plaintiff returned to Dr. Tagalakis on January 26 for the injection. (Tr. at 389.) She was to follow up in two to three weeks for a possible second injection, if necessary. (Tr. at 390.)

On February 4, 2010, plaintiff slipped on some ice and fell, fracturing her right hip. (Tr. at 281, 283, 371, 372.) On February 5, Dr. Robert Laing performed an open reduction internal fixation of the right hip. (Tr. at 285, 375.) Plaintiff worked with physical therapy and by

---

[1]The straight leg raise test is done to help find the reason for low back and leg pain. If the person has pain down the back of the leg when the affected leg is raised, the test is positive, meaning one or more of the nerve roots may be compressed or irritated. Compression or irritation of the nerve roots leading to the sciatic nerve can have several causes, but the most common is a herniated disc at the lowest part of the back. http://www.webmd.com/a-to-z-guides/straight-leg-test-for-evaluating-low-back-pain-topic-overview.

[2]Norco contains a combination of hydrocodone, an opioid pain medication, and acetaminophen, a less potent pain reliever that increases the effects of hydrocodone. Norco is used to relieve moderate to severe pain. http://www.drugs.com/norco.html.

[3]Flexeril (Cyclobenzaprine) is a muscle relaxant. http://www.drugs.com/flexeril.html.

February 8 was ambulating with a walker and crutches. She discharged with a prescription for Vicodin[4] and follow up with Dr. Laing. (Tr. at 272.)

On February 12, 2010, plaintiff went to the emergency room ("ER") after one of her crutches slipped and she fell. (Tr. at 264.) ER doctors provided morphine and ordered x-rays (Tr. at 267), which showed no new fracture (Tr. at 269-70), and discharged her to follow up with Dr. Laing. (Tr. at 267.) Plaintiff saw Dr. Laing on February 15, reporting her mishap the previous week but indicating the pain was back to normal. Exam revealed no unusual swelling or tenderness (Tr. at 350), and x-rays showed good maintenance of position of the fracture (Tr. at 350, 351). Plaintiff was to continue non-weight-bearing for now and return for recheck in four weeks. (Tr. at 350.)

On March 15, 2010, plaintiff returned to Dr. Laing, continuing to improve but noting some groin soreness and occasional cold or tingly feeling in the right leg. X-rays showed good maintenance of position of the fracture. She requested and was given a refill of Vicodin. She was to be quarter weight-bearing and return for re-check in one month. (Tr. at 349.)

On March 18, 2010, plaintiff saw Dr. Derek Turner, her primary care physician, reporting leg swelling, coolness, and discoloration. She denied any history of vascular problems. (Tr. at 383.) Dr. Turner ordered a venous doppler exam, which showed no evidence of deep venous thrombosis, and an arterial doppler exam, which was essentially normal. (Tr. at 260, 262, 368, 369.) He also urged her to quit smoking. (Tr. at 384.)

On March 30, 2010, plaintiff saw Dr. Timothy Lesage, at the request of Dr. Turner, regarding blue toes and pain in her legs. She reported that her symptoms were not affected

---

[4]Vicodin contains a combination of acetaminophen and hydrocodone, used to relieve moderate to severe pain. http://www.drugs.com/vicodin.html.

by activity or cold. Dr. Lesage did not suspect any true anatomic blockages of her arteries. (Tr. at 347-48.) He referred her to Dr. Thomas Murphy in rheumatology for evaluation of possible Raynaud's phenomenon.[5] (Tr. at 347.)

On April 9, 2010, plaintiff saw Dr. Murphy, reporting pain and swelling in her right foot, with her toes sometimes turning different colors. Dr. Murphy noted that the vascular evaluation showed no evidence of abnormality. (Tr. at 346.) He conducted an exhaustive work-up to make sure there was no underlying associated rheumatologic condition. For foot pain, he gave her a topical cream. (Tr. at 345.)

On April 15, 2010, plaintiff returned to Dr. Laing, noting occasional soreness but overall doing well. She was partial weight-bearing on crutches, but at times had been full weight-bearing without difficulty. Exam showed no unusual hip, groin, or thigh tenderness, and x-rays showed good maintenance of position of her right femoral fracture. (Tr. at 343, 367.)

On April 23, 2010, plaintiff saw Dr. Murphy, reporting pain all over and feeling a little depressed. Dr. Murphy noted a history of Raynaud's symptoms, for which they did not uncover an underlying rheumatologic explanation. She reported significant pain on the sides of both hips, as well as some muscle aches throughout her body. She had been having lateral hip pain, consistent with trochanteric bursitis, diffuse body pain, and some numbness, tingling, and neuropathic symptoms in her lower legs. On exam, she had 5/5 strength in the arms and legs, but pain and tenderness over all the fibromyalgia tender points,[6] as well as pain and

---

[5]Raynaud's phenomenon is a condition in which cold temperatures or strong emotions cause blood vessel spasms, blocking blood flow to the fingers, toes, ears, and nose. See http://www.nlm.nih.gov/medlineplus/ency/article/000412.htm.

[6]Fibromyalgia is a condition involving pain, fatigue, disturbed sleep, stiffness, "and – the only symptom that discriminates between it and other diseases of a rheumatic character –

4

tenderness over the right and left trochanteric bursa. (Tr. at 341.) For fibromyalgia, Dr. Murphy stressed the importance of regular physical exercise, stress reduction, and adequate restorative sleep. He started her on Cymbalta,[7] 60 mg a day, which could also help her depressive symptoms. For trochanteric bursitis, he provided an injection on both sides for pain control. For neuropathic symptoms, he provided a low dose of Gabapentin.[8] (Tr. at 342.)

On May 7, 2010, plaintiff returned to Dr. Murphy, reporting occasional pain and discomfort but a lot better. Dr. Murphy noted that she looked like a new person on Cymbalta and Neurontin. She was now up, walking around, not having significant fibromyalgia pain. Her trochanteric pain also improved following the injection. Plaintiff stated that she now felt functional, not having significant problems. On exam, she had 5/5 strength in her arms and legs. She had pain and tenderness over the fibromyalgia tender points but with dramatic improvement since her last visit. She had essentially no pain over the trochanteric bursa on exam. Dr. Murphy assessed quite dramatic improvement in fibromyalgia with pharmacologic therapy and lifestyle modification. He continued her on Cymbalta, 60 mg per day. (Tr. at 339.) For numbness, tingling, and neuropathic symptoms, he continued her on Neurontin, on which she was doing significantly better. The trochanteric bursitis had essentially resolved after the injection. Her depression was also better on Cymbalta. Plaintiff stated that she had more

---

multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch." Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996).

[7]Cymbalta is used to treat depression, anxiety, and fibromyalgia. http://www.drugs.com/cymbalta.html.

[8]Gabapentin (Neurontin) is used to treat nerve pain. http://www.drugs.com/gabapentin.html.

energy and was sleeping better at night. The last time Dr. Murphy had seen her, she was wheelchair bound and in a great deal of pain; now she was ambulatory with a cheerful disposition. (Tr. at 340.)

About two weeks after starting the Cymbalta and Gabapentin, plaintiff developed a rash, which Jennie Christman, NP, suspected to be an allergic reaction, instructing plaintiff to stop the medications and follow up with Dr. Murphy. (Tr. at 379, 381.) On May 12, 2010, plaintiff saw Dr. Murphy, reporting that everything had been going great, but she was now having symptoms of rash and achiness in her right arm and chest. Dr. Murphy noted that plaintiff's severe fibromyalgia had improved with initiation of Cymbalta, and her neuropathic symptoms had improved on Neurontin. However, she now had a fairly significant rash on her right elbow and right upper chest, which was pruritic and painful. For the rash, Dr. Murphy prescribed prednisone and suspended Cymbalta, although he did not think this was responsible for the rash. (Tr. at 337.) He wanted to restart Cymbalta as it helped dramatically with her symptoms of fibromyalgia and depression. (Tr. at 337-38.)

On May 27, 2010, plaintiff returned to Dr. Laing, doing quite well, full weight-bearing without difficulty and denying problems other than activity-related achiness at times. On exam, her gait was unremarkable, and her hip showed good improvement with strength and motion. (Tr. at 336.) X-rays showed good progression of healing. (Tr. at 336, 366.) They discussed a gradual increase in activity, and Dr. Laing provided a prescription for Mobic, a non-steroidal anti-inflammatory ("NSAI"). (Tr. at 336.)

On June 4, 2010, plaintiff saw Dr. Murphy, feeling really depressed. She stated that her fibromyalgia pain recurred off the Cymbalta; she rated her pain as extraordinarily severe, 10/10 at times. The rash had resolved on discontinuation of Cymbalta. She stated that when started

6

on Cymbalta she felt her problems were answered, but now she was back to square one. (Tr. at 335.) For fibromyalgia, Dr. Murphy started plaintiff on a low dose of Lyrica,[9] 50 mg per day. He noted that she had been depressed because of the fibromyalgia, but she denied any thoughts of harming herself or others. She stated that she felt like a new person on Cymbalta, and Dr. Murphy hoped the Lyrica would get her doing better again. Dr. Murphy attributed her fatigue to lack of exercise, the severity of her fibromyalgia, and smoking. Her trochanteric bursitis was better after the injection, and Dr. Murphy had her work on stretching exercises. She also reported mild knee pain, and Dr. Murphy had her work on quadriceps strengthening exercises. (Tr. at 334.) Finally, Dr. Murphy provided Flexeril for muscle cramps. (Tr. at 333-34.)

Plaintiff next saw Dr. Murphy on June 25, 2010, doing a little better with Lyrica, not having as much pain. (Tr. at 331.) She reported some sciatic pain with radiation down her right leg. On exam, she had 5/5 strength in her extremities, and no active or chronic synovitis.[10] For fibromyalgia, Dr. Murphy had her work on regular physical exercise, stress reduction, and adequate restorative sleep. (Tr. at 331.) She was doing better with Lyrica, so Dr. Murphy increased the dose from 50 to 75 mg. (Tr. at 331-32.) For fatigue, Dr. Murphy offered a prescription for Chantix to help with smoking cessation, but plaintiff declined. For sciatica, he referred her to physical therapy for stretching and range of motion exercises. For trochanteric burstis, he had her work on stretching exercises. For muscle cramps, he maintained her on

---

[9]Lyrica (Pregabalin) is an anti-epileptic drug, used to control seizures and to treat fibromyalgia. http://www.drugs.com/lyrica.html.

[10]Synovitis is inflammation of a synovial membrane, especially that of a joint. Stedman's Medical Dictionary 1773 (27th ed. 2000).

Flexeril. For depression, she reported improvement with better management of her fibromyalgia. She reported no significant issues with her Raynaud's. (Tr. at 332.)

On June 28, 2010, plaintiff returned to Dr. Laing for follow up, with her hip doing quite well but with some increased problems with low back pain. One exam, she had some generalized lumbar tenderness. The right hip showed no unusual tenderness or swelling. Straight leg raising was negative. (Tr. at 329.) X-rays showed good progression of healing of her fracture. (Tr. at 329, 330.) From the hip standpoint, they discussed appropriate activity precautions, planning a re-check in two months. For her back, Dr. Laing arranged a consultation. (Tr. at 329.)

On July 19, 2010, plaintiff saw Dr. Ofer Zikel, a neurosurgeon, on referral from Dr. Laing for evaluation of mechanical low back pain. Dr. Zikel noted that plaintiff was healing well from the surgery, with diminishing hip and leg pain. She did not report any radicular symptoms, with the pain localized in the lower lumbar area. On exam, gait and station were normal, strength testing normal, and sensory exam intact. Dr. Zikel assessed mechanical low back pain, likely due to lumbar spondylosis[11] exacerbated by her recent fall. He ordered an MRI and referred her to Advanced Pain Management to discuss percutaneous treatment options. (Tr. at 328.) Depending on the results of the MRI, more invasive treatment options could be available. (Tr. at 327-28.) Once she had healed from the surgery, physical therapy ("PT") would also be recommended. (Tr. at 327.)

On July 23, 2010, plaintiff returned to Dr. Murphy, reporting that she felt "pretty good right now." (Tr. at 326.) Aside from low back pain, she was otherwise doing terrific in regards

---

[11]Spondylosis is degeneration of a portion of the vertebra. Stedman's Medical Dictionary 1678 (27th ed. 2000).

8

to symptoms of fibromyalgia. Following initiation of treatment with Lyrica, she felt "like a 'new person.'" (Tr. at 326.) She had a history of mild Raynaud's, which was not bothering her at the time. She also had a history of depression, which she felt had improved. On exam, she had 5/5 strength in the arms and legs, with no evidence of active or chronic synovitis. Regarding depression, she was "doing terrific," with Lyrica helping her quite dramatically. She was also doing well regarding muscle cramps and would continue to take Cyclobenzaprine as needed. Regarding trochanteric burstis, she was no longer having trochanteric pain, doing better after an injection, and would work on stretching exercises. Regarding fatigue, she reported that her energy level had improved dramatically. (Tr. at 326.) For fibromyalgia, she was to continue working on regular exercise, stress reduction, and adequate restorative sleep. Dr. Murphy continued to maintain her on Lyrica. The only issue at that time was some persistent back pain. She was to complete an MRI,[12] and Dr. Murphy believed she would benefit from further evaluation in the Pain Clinic. (Tr. at 325.)

On July 27, 2010, plaintiff saw Dr. Tagalakis and Aileen Rosenberg, NP, at Advanced Pain Management, with a chief complaint of low back pain. (Tr. at 391.) On exam, she was moderately tender over her lumbar spine and bilateral lumbar paraspinal muscles. (Tr. at 392.) Plaintiff reported excellent relief after the previous injection on January 26, 2010, until she fell and fractured her hip. She no longer had right leg pain or paresthesias but reported ongoing low back pain that had failed conservative therapy. She was scheduled for lumbar medial branch blocks. (Tr. at 393.)

---

[12]A July 23, 2010, MRI of the spine revealed scattered degenerative changes, including a protruding disc at T11-12 with possible nerve root involvement. (Tr. at 248-49, 364-65, 427-28.)

On August 17, 2010, plaintiff reported continued disabling axial low back pain and wanted to proceed with the medial branch blocks to further evaluate the source of her pain, but these had been denied by her insurance due to lack of physical therapy. Plaintiff advised that Dr. Laing had recommended against PT due to her recent right hip surgery. Dr. Tagalakis agreed to call the insurance company to attempt to get approval.[13] He also issued prescriptions for Norco and Flexeril. (Tr. at 395.) Finally, NP Rosenberg referred plaintiff to the pain psychology group. (Tr. at 396.)

On August 20, 2010, plaintiff saw Dr. Murphy, reporting that she was "doing pretty good" with "some low back pain sometimes." (Tr. at 324.) Dr. Murphy noted that she was doing "quite dramatically better on Lyrica." (Tr. at 324.) She was also taking Cyclobenzaprine for muscle aches and myalgia. On exam, she had 5/5 strength in her arms and legs, and no evidence of active synovitis. Dr. Murphy noted that she was doing very well regarding her fibromyalgia, continuing to work on regular exercise, stress reduction, and adequate restorative sleep. He maintained her on Lyrica. For low back pain, Dr. Murphy indicated plaintiff could take Tylenol as needed and Cyclobenzaprine for muscle cramps. Overall, she was doing very well, with her pain level down to 1-2/10. For trochanteric bursitis, Dr. Murphy had her work on stretching exercises, and she was also doing significantly better in this regard. (Tr. at 324.) Regarding depression, plaintiff said she felt good, more optimistic. (Tr. at 323.)

On August 26, 2010, plaintiff returned to Dr. Laing, continuing to do well status post right hip fracture. She noted some achiness in the hip at times, particularly with stairs. She was going to start working with physical therapy. On exam, she had mild stiffness and weakness.

---

[13]Plaintiff subsequently started PT, as discussed in note 14, infra.

(Tr. at 322.) X-rays showed progressive healing. (Tr. at 322, 363.) Dr. Laing's impression was that she was doing well. (Tr. at 322.)

On August 31, 2010, plaintiff returned to NP Rosenberg and Dr. Tagalakis. (Tr. at 397.) On exam, she was moderately tender over her lumbar spine and across the right buttock/hip areas. She had completed one PT visit and did not know if it was helping yet.[14] She wanted to consider having the lumbar medial branch blocks if her pain did not improve. She had met with Dr. Schaefer and planned to continue in counseling with her. (Tr. at 398.) Dr. Tagalakis provided prescriptions for Norco, with an increased dose, and Flexeril. (Tr. at 399.) On September 29, plaintiff reported that her pain was unchanged since the last visit. (Tr. at 400.) On exam, she was mildly tender over her lumbar spine. She had pain with lumbar facet loading bilaterally. She had completed physical therapy and continued to do the home exercise program daily. She reported that PT only mildly helped her pain. She continued to have disabling low back pain, which significantly affected her daily functioning. She wanted to proceed with lumbar medial branch blocks. (Tr. at 401.) She continued to meet with Dr. Schaefer, which helped her to effectively deal with her pain issues. She also felt the increased Norco helped. (Tr. at 402.)

On October 1, 2010, plaintiff saw Dr. Murphy, noting some pain in her right hip. She was doing significantly better with fibromyalgia and chronic pain issues on Lyrica. She reported occasional mild symptoms of fatigue, myalgia, and muscle aches. She also had underlying depression but stated she was doing significantly better. Her pain level was down to 2/10

---

[14]Physical therapy notes indicate that she attended from August to October 2010. (Tr. at 234-46, 426.) She showed a good response to treatment, reporting tolerating more activity and the ability to walk her dog longer distances. (Tr. at 239.)

except for her right hip, where she was having excruciating pain and difficulty sleeping. She was also followed in the pain management clinic for significant low back pain. On exam, she had pain centered over her right trochanteric bursa, and pain and tenderness over most of the fibromyalgia tender points. She was doing well regarding her depression, with no thoughts of harming herself or others. For fibromyalgia, she was doing better on the Lyrica, and Dr. Murphy slightly increased the dose. (Tr. at 321.) For fatigue, she was working on regular exercise and lifestyle changes. For back pain, she was to continue with the pain management clinic, where she was scheduled to undergo a medial branch block. For trochanteric bursitis, Dr. Murphy administered an injection for pain control. (Tr. at 320.)

On October 19, 2010, plaintiff returned to Dr. Tagalakis for a lumbar facet block. (Tr. at 403.) She reported being pleased with her progress with Dr. Schaefer. She denied any side effects from the Norco, which helped her pain. (Tr. at 404.) On November 4, Dr. Tagalakis administered a second lumbar facet block, with plaintiff reporting relief for two hours after the first procedure. (Tr. at 405.) She was to follow up in two weeks for denervation.[15] (Tr. at 406.)

On November 22, 2010, plaintiff checked in with Dr. Laing, reporting no problems since her last visit. She continued to have back problems, which were responding somewhat to treatment with Dr. Tagalakis. She noted occasional achiness in the right hip. On exam, her right hip showed minimal stiffness/weakness. (Tr. at 319.) An x-ray showed progressive healing of her right femoral neck fracture. (Tr. at 362.)

On November 24, 2010, plaintiff returned to Dr. Tagalakis, reporting that her back pain

---

[15]Radio-frequency denervation is a procedure used to treat neck and back pain by heating nerves to prevent them from sending pain signals. See http://www.ohsu.edu/xd/health/services/spine/getting-treatment/conditions-treatments/radiof requencyfacetdenervation.cfm.

12

improved for 12 hours after the last visit. They proceeded with radio-frequency denervation on the left side to treat her pain. (Tr. at 407.) She was return in one to two weeks for right sided denervation. (Tr. at 408.) On December 8, plaintiff returned, noting 70% relief since her last visit (Tr. at 409), and Dr. Tagalakis performed the denervation procedure on the right side (Tr. at 410).

On December 21, 2010, plaintiff saw Dr. Murphy, stating: "I am doing pretty good. I am not having too many problems. I have gained a little bit of weight though." (Tr. at 318.) On exam, she had pain and tenderness over a couple of fibromyalgia tender points but significantly improved. For trochanteric bursitis, Dr. Murphy had her work on stretching exercises; for muscle cramps, she was to take Cyclobenzaprine; and for fibromyalgia, she was to continue taking Lyrica, exercising, and trying to get adequate restorative sleep. Regarding depression, she stated that she was feeling terrific overall, and Dr. Murphy noted this was the best he had seen her looking for some time. (Tr. at 318.) Regarding fatigue, she stated that her energy level had improved, and she was working on exercise. Finally, she reported improved knee pain, and Dr. Murphy had her work on quadriceps strengthening exercises.[16] (Tr. at 317.)

On January 5, 2011, plaintiff returned to NP Rosenberg and Dr. Tagalakis, reporting 85% pain relief since her last visit. (Tr. at 411, 526.) On exam, she was non-tender over the lumbar spine and reported being very happy with the pain relief she received from the denervation procedures. She had been able to increase her daily activities with less pain. For instance, she had been able to walk her dogs with minimal pain, whereas she had been unable to walk them at all due to pain prior to the procedures. She continued to have some right

---

[16]On December 24, 2010, plaintiff underwent a bone density study ordered by Dr. Murphy, which was normal. (Tr. at 359-60.)

hip/groin pain, and they discussed further physical therapy. (Tr. at 412, 528.) She was without insurance at the time and would consider it next month if she continued to have pain. (Tr. at 412-13, 528.) She did not need a refill of Norco or Flexeril and had decreased her consumption of both. (Tr. at 413, 528.)

On February 3, 2011, plaintiff denied new pain since the last visit. (Tr. at 414, 523.) She reported only occasional low back pain but continued to have some right hip/groin pain on a daily basis. They discussed a trial of PT, but she had a difficult time with it due to the pain previously. (Tr. at 415, 525.) She was scheduled to start a new job soon and wanted to hold off until she knew her work schedule. (Tr. at 415-16, 525.) NP Rosenberg issued prescriptions for Norco and Flexeril, which helped plaintiff's pain without side effects. (Tr. at 416, 525.) On March 3, plaintiff reported occasional low back pain but some right hip/groin pain on a daily basis. NP Rosenberg and Dr. Tagalakis ordered PT and provided another prescription for Norco.[17] (Tr. at 418, 522.)

On March 21, 2011, plaintiff saw Dr. Murphy, reporting pain in the side of her hip again. She had been doing well on Lyrica but went off it following a change in insurance. Dr. Murphy reinitiated treatment with Lyrica, as it was helping significantly with her fibromyalgia symptoms. On exam, she had 5/5 strength in the legs and arms, but pain and tenderness over her right lateral hip and a couple fibromyalgia tender points. (Tr. at 316, 646.) For her hip, Dr. Murphy provided an injection in the right trochanteric bursa. She was less depressed, which affected her fibromyalgia in a positive way. Regarding fatigue, she was working on regular physical

_____

[17]From March 2011 to May 2011, plaintiff attended physical therapy for her right hip. (Tr. at 221-32, 559-70.) According to the discharge note, she demonstrated significant improvement in hip strength and reported improved walking tolerance and endurance. (Tr. at 221, 559.)

exercise and again counseled on smoking cessation. (Tr. at 315, 645.) Dr. Murphy provided a prescription for Chantix to aid in smoking cessation and help with some of her symptoms of fatigue. (Tr. at 314, 644.)

On March 31, 2011, plaintiff returned to NP Rosenberg and Dr. Tagalakis, reporting that her back pain had improved since the last visit. (Tr. at 420, 517.) On exam, she was non-tender over her lumbar spine but mildly tender over her right lateral hip area. She reported that PT was helping her right hip/groin pain, as well as her mobility and range of motion. She was issued a prescription for Norco. She reported not taking the Norco on a daily basis and hoped to wean completely off of it. She did not need a refill of Flexeril, which she took only occasionally. (Tr. at 421, 519.)

On May 23, 2011, plaintiff saw Dr. Laing, reporting occasional achiness, particularly when on her feet for long periods, but no associated instability or radicular symptoms. On exam, the hip showed only minor stiffness, weakness, with no atrophy. X-rays showed a healed fracture, with minor degenerative changes. Dr. Laing's impression was that plaintiff was doing well. She requested a prescription NSAI, and Dr. Laing provided Mobic. (Tr. at 311, 640, 641.)

On May 26, 2011, plaintiff saw NP Rosenberg and Dr. Tagalakis, doing very well. (Tr. at 423-24.) She had completed PT and reported no low back or groin pain. She continued to have some right hip pain. She had seen Dr. Laing, who noted some arthritic changes in her right hip, starting her on Mobic. She had weaned completely off Norco and Flexeril. (Tr. at 424, 516.)

On June 29, 2011, plaintiff returned to Dr. Murphy, indicating she felt tired and fatigued. She was very depressed and tearful, relating problems with her son. She was taking Lyrica for

management of underlying fibromyalgia. She indicated that stress associated with her son's legal problems had worsened her symptoms of muscles aches and myalgia. (Tr. at 453, 639.) For fatigue and fibromyalgia, they had her work on regular physical exercise, stress reduction, and adequate restorative sleep. Dr. Murphy maintained her on Lyrica. He believed that if they could get her stress and anxiety under better control, they would see improvement in her fibromyalgia. (Tr. at 454, 638-39.)

On July 11, 2011, Dr. Laing prepared a letter to plaintiff's lawyer regarding the slip and fall accident. He described plaintiff's injury, treatment, and follow up. In terms of prognosis regarding permanency and further treatment, at that point none was planned. He noted that plaintiff could be at risk for faster arthritic deterioration in this hip and some small risk of avascular necrosis of the femoral head following the injury. (Tr. at 252, 637.)

On August 29, 2011, plaintiff returned to Dr. Murphy complaining of pain in the right hip again. (Tr. at 450, 635.) She had been taking Neurontin in conjunction with Effexor,[18] which helped her fibromyalgia and depression. (Tr. at 450-51.) She also complained of some achiness and fatigue. On exam, she had severe pain and tenderness of her trochanteric bursa. For fibromyalgia and fatigue, they continued her current regimen. For hip pain, Dr. Murphy provided an injection. (Tr. at 451, 634-35.)

On September 13, 2011, plaintiff went to the emergency room complaining of right hip and leg pain. (Tr. at 552.) She reported no new trauma or unusual activity leading to the onset of pain. (Tr. at 553.) On exam, she was moderately tender to palpation over the right anterior thigh. (Tr. at 554.) Dr. Sarah Silver diagnosed tenderness in lower limb, providing Vicodin and

---

[18]Effexor (Venlafaxine) is an antidepressant used to treat major depressive disorder, anxiety, and panic disorder. http://www.drugs.com/effexor.html.

ordering an x-ray, which showed stable post-operative changes with no acute process. (Tr. at 456, 554-55, 558, 633.)

On September 27, 2011, plaintiff returned to Dr. Murphy, complaining of muscle cramps and hip/groin pain. On exam, she had 5/5 strength in her arms and legs. There was no evidence of active synovitis, but she did have pain and tenderness over most of the myalgia tender points. (Tr. at 449.) For fybromialgia and fatigue, Dr. Murphy restarted Lyrica; the Gabapentin was not controlling her symptoms. For muscle cramps, he provided Flexeril. For hip pain, he referred her to radiology for an injection. (Tr. at 450, 632.) On October 14, plaintiff underwent an ultrasound guided right hip injection. (Tr. at 448, 455, 551, 629, 630.)

On November 7, 2011, plaintiff saw Matthew Kaplan, DO, on referral from Dr. Murphy, regarding her low back and occasional right leg pain. She described almost one-year pain relief from the denervation treatment at Advanced Pain Management. She rated her current pain at 4/10, banding across the low back, the same pain that brought her initially to Advanced Pain Management. She also reported right leg pain and spasm. (Tr. at 446, 626.) She believed that some of the pain in the right thigh could be related to the hip fracture, but there was some pain that could be explained by other pathologies. (Tr. at 446-47, 626.) On exam of the lumbar spine, axial loading of the lumbar facet joints recreated her pain. She also had tenderness over the lumbar facet joints, as well as regional myofascial tenderness. Review of plaintiff's MRI revealed facet hypertrophy at multiple levels, as well as some disc herniations. There was a disc herniation at L3-L4 possibly compressing the right L3 nerve root, which would explain the right leg pain. Dr. Kaplan assessed lumbar facet syndrome, lumbar radiculopathy,

17

and myofascial pain. Plaintiff was to continue using a TENS unit.[19]  They would also do a trial of intra-articular facet injections; if she got relief, they would continue on to repeat radio-frequency denervation.  They would address the right leg pain later, but plaintiff could benefit from a right L3 nerve root block.  (Tr. at 447, 627-28.)

On November 16, 2011, plaintiff returned to Dr. Murphy, complaining of some pain in her knees and right hip.  Her fibromylagia was significantly better on Lyrica, and Dr. Murphy continued that long-term.  She did report some persistent right hip pain, even after an injection of the hip, which she described as anterior hip pain radiating into her groin.  (Tr. at 445.)  For depression, Dr. Murphy maintained her on Effexor, as she was doing very well in this regard.  Her energy level had improved on Lyrica.  For back pain, she could continue to follow with Dr. Kaplan,[20] and for hip pain they referred her to orthopedics.  (Tr. at 446, 624-25.)

On November 23, 2011, plaintiff saw Dr. Jeffrey Butler in orthopedics for evaluation of her right hip.  On exam, she had 90 degrees of flexion in the hip, and no pain with rotation.  He reviewed x-rays, which showed three screws across her femoral neck.  He ordered a bone scan.  (Tr. at 621, 695.)

On December 29, 2011, plaintiff returned to Dr. Murphy, feeling depressed and having bad hip pain.  She also reported some recent memory issues.  On exam, she had pain and tenderness over most fibromyalgia tender points.  (Tr. at 616, 693.)  For depression, Dr.

---

[19]TENS ("Transcutaneous Electrical Nerve Stimulation") units are used to treat nerve-related pain conditions.  They work by sending stimulating pulses across the surface of the skin and along the nerve strands.  http://www.tensunits.com/.

[20]On November 22 and 29, 2011, Dr. Kaplan administered right lumbar facet injections. (Tr. at 547, 549.)

Murphy started her on Wellbutrin.[21]  For fibromyalgia and fatigue, he increased her Neurontin dose.  For muscle cramps, they continued Cyclobenzaprine.  For hip pain, he referred her for a repeat injection.  Based on her reports of difficulty functioning, Dr. Murphy also referred her for a formal functional capacity assessment.  For memory issues, he referred her to the neurology department.  (Tr. at 617, 694.)

On January 24, 2012, plaintiff saw Nathalie King, PA, on referral from Dr. Murphy, reporting memory problems for about the past eight months.  (Tr. at 495, 597.)  PA King found the etiology of the problems unclear, although plaintiff's underlying affective disorder and/or fibromyalgia may play a role.  PA King scheduled a brain MRI (Tr. at 496, 598), which revealed no acute intra-cranial findings and minimal inflammatory changes in the left mastoid air cells (Tr. at 504, 532, 595, 596).

On January 31, 2012, plaintiff underwent a functional capacity evaluation ("FCE") with David Benavides, MS, CHT, OTR, CEAS, on Dr. Murphy's referral.  Plaintiff reported remaining independent with all activities of daily living.  She was able to perform light house work but not strenuous activity.  She denied continuing to perform home flexibility or strengthening and conditioning exercises but did walk her dog.  (Tr. at 533.)  She reported pain of 2-3/10 at the least, 8-9/10 at worse, and 6/10 prior to the FCE.  She denied any functional limitation in upper extremity sensation, and exam was negative aside from mildly positive Tinel's at the right wrist.[22]  (Tr. at 534.)  She denied functional limitation in grip strength and dexterity.  (Tr. at 538-

---

[21]Wellbutrin (Bupropion) is an antidepressant medication used to treat major depressive disorder and seasonal affective disorder.  http://www.drugs.com/wellbutrin.html.

[22]Tinel's sign is tingling, numbness, or "pins and needles" sensation in the hand when tapped on the wrist, a possible indication of carpal tunnel syndrome. http://www.webmd.com/pain-management/carpal-tunnel/physical-exam-for-carpal-tunnel-sy

39.)  She also denied any significant functional limitation in sitting.  (Tr. at 539.)  She could

stand for two hours before requiring sit-down rest.  (Tr. at 539.)  Throughout the day, she could

stand 34-66% of the time.  She refused to continue the walking test due to pain and fatigue,

but Benavides questioned why she could walk throughout the entire evaluation and when

requested to walk displayed unorthodox movement patterns and could only walk for less than

four minutes; she also stated that she could walk her dog at home.  Plaintiff was able to walk

two flights of stairs but reported shooting pain in her thigh and knee.  She was able to climb 5

of 15 step ladder steps.  (Tr. at 540.)  She refused to climb a vertical ladder.  She was also

unable to crawl due to reported right knee pain.  She was able to kneel once, with difficulty due

to pain.  She was able to stoop without limitation.  (Tr. at 541.)  She was able to squat five

times before stopping due to quad fatigue.  She showed good balance.  She was able to lift 12

pounds to waist level with the left arm and 15 pounds with the right.  (Tr. at 542.)  With both

hands, she could lift 25 pounds to waist level.  Her maximum push and pull were 30 pounds.

Benavides concluded that plaintiff could perform light work, lifting up to 20 pounds occasionally,

10 pounds frequently, working full time.  She could stand frequently, sit constantly, and walk

frequently, so long as she changed positions during breaks and lunch periods.  (Tr. at 544.)

She had no limitations in reaching, grasping, fingering, and feeling.  (Tr. at 545.)  She could use

her left foot for repetitive movements but not her right.  (Tr. at 546.)

On February 20, 2012, plaintiff returned to Dr. Murphy.  She reported feeling better and

cutting back on her smoking.  The Wellbutrin had improved her symptoms of depression and

helped with smoking cessation.  Her pain level was down to about 3/10.  Dr. Murphy found that

_____

ndrome.

she was improving but not yet quite where he would like her to be. On exam, she had 5/5 muscle strength in the arms and legs, with no evidence of active synovitis. She had pain and tenderness over several fibromyalgia tender points. (Tr. at 494, 594.) For fibromyalgia, Dr. Murphy increased her Neurontin dose. He also started her on Vitamin D and provided a prescription for Tramadol for pain control.[23] Her depression was tremendously better, which also helped with her fibromyalgia and energy level. She was doing reasonably well with her trochanteric bursitis. She could take Tramadol as needed. (Tr. at 493, 593.)

On March 6, 2012, plaintiff saw Dr. Turner for a physical. (Tr. at 489, 589.) Her blood pressure was borderline, and Dr. Turner urged her to quit smoking. He also ordered a lipid panel. (Tr. at 492, 592.)

On March 9, 2012, plaintiff saw Dr. Karl Scheidt, an orthopedic surgeon, complaining of pain in her right groin, anterior thigh, and posterior hip. Prolonged walking, squatting, and stairs bothered her. She had cortisone shots, but the relief did not last long. She was at the time taking Venlafaxine (Effexor), Gapabentin, Bupropion (Wellbutrin), Cyclobenzaprine, and Tramadol. She was able to ambulate without assistive devices. (Tr. at 486, 584.) On exam, she had full range of motion of the right hip, with mild groin discomfort, but marked discomfort over the screw heads over the lateral aspect of the hip. (Tr. at 487, 485.) X-rays showed a healed right femoral fracture, status post pinning with three screws. The joint space was well-maintained, but the screw heads were prominent laterally. No significant degenerative changes were noted in the right hip. (Tr. at 485, 487, 583, 585.) Dr. Scheidt's impression was that plaintiff had symptomatic hardware of the right hip. She did have a prior bone density test,

---

[23]Tramadol is a narcotic-like pain reliever used to treat moderate to severe pain. http://www.drugs.com/tramadol.html.

which was normal.  They discussed surgical removal of the hardware or living with the discomfort.  (Tr. at 487, 585.)  Plaintiff wanted to discuss the surgery with her family.  (Tr. at 487-88, 585-86.)

On March 19, 2012, plaintiff returned to PA King for followup of her complaint of memory problems.  She reported no changes since the last visit on January 24, 2012.  Her depression and chronic pain were not well controlled.  The brain MRI from February 1, 2012, showed minimal inflammatory changes in the left mastoid air cells but no other intra-cranial findings.  Blood work was within normal limits, and neurological exam was largely normal.  PA King assessed complaint of memory problems of approximately 10 months' duration, likely due to an underlying affective disorder.  (Tr. at 581.)  Plaintiff would be watched further clinically from a neurologic standpoint and be seen for reassessment in six months.  (Tr. at 582.)

On May 21, 2012, plaintiff saw Dr. Murphy, reporting some pain in her arms and legs.  She took Cyclobenzaprine occasionally for muscle cramps.  She also had a history of depression but was doing better on Wellbutrin.  She talked to Dr. Murphy about potential fibromyalgia disability options, but he "told her I really do not think this is something that she is going to be able to obtain long-term disability for."  (Tr. at 579, 676.)  She also had a history of osteoarthritis involving her hips and had discussed with Dr. Scheidt the possibility of surgical revision.  On exam, she had 5/5 muscle strength in the arms and legs, but pain and tenderness over several myalgia tender points.  (Tr. at 579, 676.)  For depression, she would continue on Wellbutrin.  For fibromyalgia and fatigue, they continued Gabapentin.  For hip pain, she was to follow up with Dr. Scheidt.  For shoulder pain, they referred her to physical therapy for range of motion exercises and provided samples of Baclofen cream.  (Tr. at 580, 677.)

On September 19, 2012, plaintiff followed up with PA King regarding her memory

problems, reporting no significant change in her neurologic status since the previous visit on March 19.  Her depression and chronic pain were not well controlled, and she had not been sleeping well.  (Tr. at 574, 674.)  PA King assessed memory problems of about 1-½ years duration, likely due to underlying affective disorder.  Plaintiff also displayed generalized hyper-reflexia, likely due to anxiety and depression.  PA King referred her to Dr. Anjana Nair for evaluation of sleep disturbance and fatigue.  (Tr. at 575, 675.)

On September 24, 2012, plaintiff returned to Dr. Murphy, still feeling tired and not sleeping well.  (Tr. at 576, 672.)  She was doing fairly well regarding fibromyalgia and depression, not having much in the way of hip and leg pain.  (Tr. at 576-77.)  The main issue was difficulty falling asleep.  She had a touch of hand pain without significant swelling.  For fibromyalgia, they continued to have plaintiff work on regular physical exercise, stress reduction, and adequate restorative sleep.  They would continue to monitor her hand pain.  For muscle cramps, they continued her on Cyclobenzaprine.  For pain control, she could continue to take Tramadol as needed.  For depression, they maintained her on Effexor.  On exam, she had 5/5 strength in the arms and legs, with no active synovitis.  (Tr. at 577, 673.)

On October 1, 2012, plaintiff saw Dr. Nair, a neurologist, regarding her sleep disturbance and fatigue.  (Tr. at 571.)  Plaintiff reported that pain in her right leg kept her up at night.  (Tr. at 571-72.) She denied excessive anxiety at bedtime.  She reported being tired during the day but was unable to fall asleep and did not nap.  She did report significant caffeine consumption, even prior to bedtime.  They discussed behavioral and lifestyle modification for treatment of insomnia, including regular bedtimes, caffeine minimization, and regular exercise. (Tr. at 572.) Dr. Nair also started a trial of Ambien.  (Tr. at 573.)  On November 20, plaintiff reported some improvement on Ambien.  Her bedtime and wake-up schedule continued to be erratic, and she

continued to consume four to five cups of coffee and four to five cans of Coke through the day. She denied side effects of the Ambien. (Tr. at 666.) Dr. Nair suspected sleep onset maintenance insomnia, for multi-factorial reasons, including poor sleep hygiene and chronic pain. Dr. Nair continued her on Ambien and told her to minimize caffeine. (Tr. at 667.)

On November 26, 2012, plaintiff asked Dr. Turner to take over her medications, as Dr. Murphy was leaving. She needed a refill of Wellbutrin. She occasionally took Tramadol and Flexeril. She got Ambien from neurology for sleep. She had been on Lyrica but that was not covered so she was given Neurontin, which she took on occasion, once or twice per month. (Tr. at 661.) For depressed mood, Dr. Turner renewed Wellbutrin, which helped with mood and energy. For fibromyalgia, he continued Flexeril as needed. She was not taking Gabapentin regularly, so he discontinued that. He did continue Tramadol. (Tr. at 665.)

On January 21, 2013, plaintiff returned to Dr. Nair, reporting improvement in her sleep on Ambien. She denied side effects. (Tr. at 657.) Dr. Nair advised her to maintain consistent bedtimes, minimize caffeine, and continue on Ambien. (Tr. at 658.)

**B.     Procedural History**

**1.      Plaintiff's Application and Supporting Materials**

In July 2011, plaintiff filed applications for disability insurance benefits and supplemental security income. (Tr. at 127, 134.) In her disability report, plaintiff indicated that she could not work due to a hip fracture, back injury, groin pain, and fibromyalgia. (Tr. at 161.) She reported previously working as a server in various restaurants from 1979 to 2010. (Tr. at 162.) In her function report, plaintiff alleged erratic sleep, daily pain, fatigue/poor concentration, and limited stamina for walking, bending, and lifting. (Tr. at 172.) She reported that on a typical day she

would shower, read, walk her small dog short distances, watch TV, do light housework, attempt to nap, and sometimes write letters.  Her friends helped with dog walking.  She reported being much slower in tending to her personal care.  (Tr. at 173.)  She made her own meals, preparing a full dinner two to four times per week.  She also reported doing household chores such as dusting, wiping counters, and occasional vacuuming.  (Tr. at 174.)  She could go out alone and drive a car.  (Tr. at 175.)  She went grocery shopping once per week and got help carrying.  She could handle her finances.  (Tr. at 175.)  Her hobbies included reading and watching TV.  She did not go out or socialize regularly.  (Tr. at 176.)  She reported trouble getting along with family but got along fine with authority figures; she had never been fired from a job because of problems getting along with other people.  (Tr. at 177-78.)  She reported that she could walk around a city block before she had to stop and rest.  She could pay attention for a couple of hours, but her ability to follow written and spoken instructions varied depending on how she felt.  (Tr. at 177.)  She used to handle stress very well but now not so well.  She no longer liked going out away from home.  (Tr. at 178.)  She reported still being in pain from the hip fracture and from fibromyalgia, as well as lower back pain.  She also reported dealing with nausea, fatigue, and anxiety.  (Tr. at 179.)  In a physical activities addendum, plaintiff reported standing 5'5-½" tall and weighing 180 pounds, up 46 pounds since her hip fracture.  She reported that her sleep varied wildly, and she sometimes napped during the day.  She could continuously sit for two to three hours, stand for one hour, and walking varied.  Over the course of a day, she could sit for seven hours, stand for three hours, and walk for three hours.  (Tr. at 180.)

In a later report, plaintiff indicated that her energy and capacity were a slight fraction of what they used to be.  She reported dealing with a lot of physical pain on a daily basis.  Her activity level dropped after her injury, leading to a weight gain of close to 50 pounds.  She

25

concluded that her life had been seriously altered, physically and emotionally. (Tr. at 182.)

In a further function report, plaintiff reported dealing with several different types of pain on a daily basis. She also reported blurred vision at times, she believed from medications. She dealt with daily fatigue, yet did not sleep well, and concentrating was often difficult. (Tr. at 189.) She reported doing light housework, dusting, washing dishes, and folding laundry, but no yard work. (Tr. at 191.) She again reported hobbies of watching TV and reading, although blurred vision and trouble concentrating sometimes made reading hard. (Tr. at 193.) She reported finding it increasingly difficult to get along with her family, so they rarely spoke. She reported paying attention nowhere near as well as before, but followed written and spoken instructions "fairly well." (Tr. at 194.) She reported no problems getting along with authority figures, but she did not handle stress or changes in routine as well as before. (Tr. at 195.)

### 2.    Agency Review

The agency arranged for plaintiff's applications to be evaluated by several consultants. On August 18, 2011, Dr. Philip Cohen reviewed the evidence and completed a physical residual functional capacity ("RFC") assessment, finding plaintiff capable of sedentary work. (Tr. at 433-40.) On December 9, 2011, psychological consultant Susan Donahoo, Psy.D., completed a psychiatric review technique report, finding no severe mental impairment. (Tr. at 457-70.) Specifically, Dr. Donahoo found mild restriction of activities of daily living, social functioning, and concentration, persistence, and pace, with no episodes of decompensation. (Tr. at 467.) On December 12, 2011, Syd Foster, D.O., completed a physical RFC report, also finding plaintiff capable of sedentary work. (Tr. at 471-79.)

The SSA denied plaintiff's applications initially on August 19, 2011 (Tr. at 65-66, 71) and on plaintiff's request for reconsideration on December 12, 2011 (Tr. at 67-68, 76, 77). On

January 17, 2012, plaintiff requested a hearing before an ALJ.  (Tr. at 88, 90.)

### 3.   Hearing

On April 9, 2013, plaintiff appeared with counsel for her hearing before the ALJ.  The ALJ also summoned a vocational expert ("VE") to testify.  (Tr. at 35.)

#### a.   Plaintiff's Testimony

Plaintiff testified that she was 49 years old, 5'5" tall, and 187 pounds (up about 50 pounds since her injury).  (Tr. at 38-39.)  She completed the twelfth grade in school, plus some college, and worked as a server from 1979 to February 2010.  Her past work involved lifting 50 to 100 pounds unloading delivery trucks.  (Tr. at 40-41.)

Plaintiff testified that in February 2010 she slipped on an ice patch, injuring her wrist and back and fracturing her hip.  She received treatment including surgery, medication, injections, and physical therapy, which did not help.  (Tr. at 42.)  After the surgery, she saw a rheumatologist, Dr. Murphy.  After Dr. Murphy left the clinic, her primary care physician, Dr. Turner, took over prescribing her medications.  (Tr. at 43-44.)  Dr. Murphy had prescribed various medications, including Lyrica, Gabapentin, Cyclobenzaprine, Bupropion, and Tramadol.  In the past, she saw Dr. Tagalakis at Advanced Pain Management for her back.  (Tr. at 45.)

Plaintiff testified that she continued to experience daily hip and groin pain.  (Tr. at 46-47.)  The pain got worse with changes in position and stairs.  She took two Venlafaxine per day, one Bupriopion per day, and Tramadol and Cyclobenzaprine as needed.  (Tr. at 47.)  She took two Zolpidem (Ambien) at night.  (Tr. at 47-48.)  Asked if the medications helped, plaintiff replied, "I honestly don't know."  (Tr. at 48.)  She took five to six Tramadol per week for pain, which helped a little bit.  She reported various side effects from her medications, including hot

flashes, nausea, muscle spasms, and fatigue. (Tr. at 48.) She stated that the anti-depressants helped some but did not get rid of everything. The sleep medication did help, although she still woke up and did not sleep through the night. (Tr. at 48, 52.)

Asked how long she could sit at one time (Tr. at 49), plaintiff replied, "I'm uncomfortable right now." (Tr. at 50.) She stated that she could sit for ½ hour before she had to move around. She could stand for 20 to 30 minutes. Asked how far she could walk, she stated that walking in from the parking ramp left her quite tired. She could lift a small bag of groceries. (Tr. at 50.) She occasionally prepared meals and did light housework (e.g., dusting, wiping counter tops). Laundry was a joint effort. She went grocery shopping twice per month. She infrequently went out. (Tr. at 51.)

Plaintiff testified that on a typical day she woke up, got coffee, read, and watched TV. (Tr. at 52.) She testified that she felt tired most of the time, and seldom watched a TV show without dozing off at some point. (Tr. at 52.) Fatigue also affected her memory and concentration, requiring her to reread passages and causing her to forget that she had let the dogs in. (Tr. at 53-54.) She used to be active with the dogs but no longer was. (Tr. at 54.) She attributed her weight gain to inactivity, possibly her medications. (Tr. at 54.)

Plaintiff testified that she had been diagnosed with fibromyalgia, which caused trouble with her arms and legs, in addition to her hip and back pain. (Tr. at 54.) Her hands sometimes felt arthritic. She testified that she dropped dishes and had trouble with fine tasks such as threading a needle, locking a door, and holding a book. (Tr. at 55.)

### b. VE's Testimony

The VE classified plaintiff's past work as a server/waitress as light, semi-skilled work, but performed at the medium level as plaintiff reported doing it. (Tr. at 57.) The ALJ then

28

asked a hypothetical question, assuming a person with plaintiff's work experience limited to sedentary work, sitting three hours at a time, but up to six hours in an eight hour workday; standing and walking up to three hours each during an eight hour day, with standing limited to one hour at a time and walking limited to 30 minutes at a time. The VE responded that such a person could not perform plaintiff's past work but could do other jobs, such as assembly, hand packager, office assistant, and security. (Tr. at 58.) If the person was also limited to simple, routine, and repetitive work tasks, and would require the option to use a cane for ambulation, these jobs would remain except for security. (Tr. at 59.) Adding a further limitation of no public contact and occasional interaction with co-workers and supervisors, the jobs would remain again except security. (Tr. at 59.) However, if the person would be off task 20% of the workday or needed to get up and walk around for five minutes every hour, the jobs would be eliminated. (Tr. at 62-63.)

### 4. ALJ's Decision

On May 28, 2013, the ALJ issued an unfavorable decision. (Tr. at 16.) Following the familiar five-step sequential evaluation process,[24] the ALJ determined at step one that plaintiff had not engaged in substantial gainful activity since February 4, 2010, the alleged onset date. (Tr. at 21.) At step two, she determined that plaintiff suffered from the severe impairments of status post femoral neck fracture with open reduction internal fixation, trochanteric bursitis, degenerative disc disease of the lumbar spine, obesity, and depression. (Tr. at 22.) At step

---

[24]Under this process, the ALJ determines: (1) whether the claimant is working (i.e., engaging in substantial gainful activity); (2) if not, whether she suffers from a severe impairment or impairments; (3) if so, whether any of those impairments qualify as conclusively disabling under the agency's Listings; (4) if not, whether the claimant retains the RFC to perform her past work; and (5) if not, whether she can perform any other work in the national economy. See, e.g., Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011).

three, the ALJ found that none of these impairments met or equaled one of the Listings, including those cited in Section 1.00 et seq (musculoskeletal system), 1.02 (dysfunction of a joint), 1.03 (reconstructive surgery or surgical arthrodesis of a major weight-bearing joint), 1.04 (disorders of the spine), and 12.04 (affective disorders). (Tr. at 22.)

The ALJ specifically discussed plaintiff's history of depression and anxiety, noting that plaintiff's depression was well-controlled with medications (Wellbutrin, Effexor, and Bupropion) prescribed by her rheumatologist, and that her primary complaint was frustration associated with situational stressors related to unemployment, financial pressure, and her son's incarceration. Dr. Murphy treated plaintiff for fibromyalgia-like symptoms and reported that her thoughts were clear and she was doing fine emotionally. Plaintiff reported sleep disturbance and was referred to Dr. Nair, a neurologist, who prescribed Ambien, which she tolerated well and which improved her sleep. Plaintiff received no mental health treatment from a psychiatrist, psychologist, or therapist during the relevant period. The ALJ accepted that plaintiff may have met "part A" of Listing 12.04 based on persistent depressive symptoms, but found that she did not meet "part B" in that she did not have the required restriction in activities of daily living; social functioning; concentration, persistence, and pace; or repeated episodes of decompensation.[25] (Tr. at 22.)

---

[25]Under the mental impairment Listings, the "paragraph A criteria" (a set of medical findings) substantiate medically the presence of a particular mental disorder. The "paragraph B criteria" describe the impairment-related functional limitations that are incompatible with the ability to work. There are four broad areas in which the ALJ rates the degree of functional limitation: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c). The ALJ rates the degree of limitation in the first three areas using a five-point scale: none, mild, moderate, marked, and extreme. The degree of limitation in the fourth area is evaluated using a four-point scale: none, one or two, three, and four or more. Id. If the ALJ rates the degree of limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, she

The ALJ noted that plaintiff reported some difficulties in daily activities, but they were primarily due to her physical limitations rather than psychiatric impairments. Plaintiff could no longer do heavy/constant lifting or be on her feet all day, but she did cook, perform light housework, and shop for groceries. Plaintiff reported trouble getting along with family but did get along well with authority figures. She did not care to participate in social activities but did go out for appointments or to run errands and lived with a friend who assisted her with expenses. Plaintiff alleged difficulty concentrating, but she continued to engage in activities that require the ability to concentrate, such as driving, reading, and managing her finances. She reported being able to follow written and oral instructions well. She had been reported to have mildly depressed mood and affect at times, but she otherwise reported doing well. (Tr. at 22.)

The ALJ noted that the state agency psychologist, Susan Donahoo, reviewed the evidence in December 2011 and concluded that plaintiff had no severe medically determinable mental impairment. However, because plaintiff had been prescribed medications for this condition by her doctors, the ALJ did not assign significant weight to the psychologist's opinion. The ALJ considered plaintiff's allegations of depression but was unable to conclude that her psychiatric condition rendered her disabled or imposed any limitations in her ability to perform

---

may generally conclude that the impairment is not severe. Id. § 402.1520a(d)(1). A claimant meets the Listing if she establishes at least two of the following: "marked" restriction in daily activities; "marked" difficulties in maintaining social functioning; "marked" difficulties in maintaining concentration, persistence, or pace; and "repeated" episodes of decompensation, each of extended duration. See, e.g., Larson v. Astrue, 615 F.3d 744, 748 (7th Cir. 2010). If the mental impairment is severe but does not meet the Listing, the ALJ must assess the claimant's mental RFC, 20 C.F.R. § 404.1520a(d)(3), which requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B. See SSR 96-8p, 1996 SSR LEXIS 5, at *13.

activities of daily living or in social functioning. The records from treating providers did not show significant limitations in mental functioning or behavior as a result of depression. The ALJ accordingly found no more than mild difficulties in maintaining activities of daily living and in social functioning. (Tr. at 23.)

The ALJ found moderate limitations in concentration, persistence, and pace. Plaintiff reported problems with concentration and memory, but she continued to drive, read, and manage her finances, and her treating doctors did not observe significant restrictions in this area. The ALJ noted that plaintiff demonstrated no difficulty testifying or answering questions at the hearing. She accordingly had no more than moderate limitation in this area. (Tr. at 23.)

The ALJ further noted that plaintiff had not sought treatment from a psychiatrist, psychologist, or therapist for her mental condition, nor did her treating providers deem it necessary to refer her for such treatment. This, the ALJ concluded, strongly suggested that plaintiff's symptoms were controlled with medication. Finally, there were no episodes of decompensation of extended duration. (Tr. at 23.)

The ALJ next concluded that plaintiff retained the RFC to perform less than the full range of sedentary work, limited to standing three hours and walking three hours during an eight-hour workday, sitting three hours at a time, standing one hour at a time, and walking 30 minutes at a time, with the option to use a cane or other assistive device for ambulation. In addition, she was limited to simple, routine, and repetitive work tasks. (Tr. at 24.) In making this determination, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 24.)

The ALJ first summarized the medical evidence, which showed that prior to the alleged onset date plaintiff was seeing Dr. Tagalakis at Advanced Pain Management for complaints of

low back pain and was diagnosed with lumbar radiculopathy, degenerative lumbar disc, and facet arthropathy based on a December 15, 2009 lumbar MRI. Treatment measures included pain medication, physical therapy, TENS unit, medial branch block injections, and in November 2010 radio-frequency neurolysis. The latest lumbar MRI, dated July 23, 2010, showed scattered degenerative changes, including protruding discs at T11-12 with possible nerve root involvement. By March 2011, plaintiff was in the process of weaning herself off her pain medication (Norco) and reported she was happy with the relief provided by the radio-frequency procedure. Her last visit to Dr. Tagalakis was on May 26, 2011, at which time plaintiff reported no further back or groin pain, only some right hip pain. (Tr. at 24.)

In February 2010, plaintiff fell on some ice and sustained a femoral neck fracture. She underwent open reduction internal fixation surgery on February 5, 2010, with persistent right hip trochanter bursitis. By May 27, 2010, an x-ray noted good progression of healing. Plaintiff was full weight bearing without difficulty and denied any problems other than activity-related symptoms at times. (Tr. at 24.) In August of 2010, plaintiff started on Lyrica with Dr. Murphy and reported a dramatic improvement in her pain symptoms. (Tr. at 24-25.)

In March 2011, Dr. Murphy suspected fibromyalgia, as the sum total of clinical documentation consisted of complaints of generalized aches and pain in her right hip, low back, and shoulders. However, examination did not reveal significant abnormalities. The ALJ indicated that treatment records from Dr. Murphy did "not characterize the 'trigger points' which are distinguishing characteristics of fibromyalgia," or that plaintiff had "area[s] of pain one could interpret as being trigger points, or muscular pain compatible with fibromyalgia." (Tr. at 25.) There was no evidence of neurological deficits, joint swelling, or atrophy on examination. The evidence showed that plaintiff had full mobility in both legs, and that she could walk throughout

the entire functional evaluation performed in January 2012 without any increased discomfort. The progress notes from Dr. Laing and Dr. Murphy through November 16, 2011, continued to report that plaintiff's post-operative recovery was going well, and that her pain was controlled with Lyrica. Examinations by Dr. Laing revealed only minor stiffness and weakness with no atrophy, no associated instability, or radicular symptoms. At a November 7, 2011 visit, plaintiff reported that she had almost a year of pain relief with the radio-frequency denervation and rated her pain at 4/10, banding across her lower back. Her strength was graded 5/5, and there were no sensory or gait deficits. (Tr. at 25.)

Plaintiff saw Dr. Murphy for follow up between January and October 2012, and he continued to monitor and refill her medications. An updated x-ray of the right hip in March 2012 showed a healed fracture, status post pinning with three screws. The screw heads were prominent, but no significant degenerative changes were noted. Clinic notes indicated that plaintiff reported mild pain on exam of her right hip, gait was normal, and she displayed full range of motion in all joints. Motor strength was normal. At a September 24, 2012 visit, Dr. Murphy reported plaintiff was doing well on Bupropion for her depression and that her chief complaint was difficulty sleeping. (Tr. at 25.)

The ALJ found insufficient evidence in the record to establish that plaintiff's sleep problems precluded her from working. Mild sleep difficulties were documented in the medical records, but there was no indication that sleep disturbance would result in greater limitations. On March 19, 2012, plaintiff saw Natalie King, PA-C, for complaints of poor sleep and daytime fatigue. Plaintiff reported drinking a pot of coffee and four cokes even in the evenings up to going to bed. She was diagnosed with insomnia, etiology multi-factorial. She was advised to stop smoking, minimize her caffeine intake, not to nap during the day, and establish a

consistent schedule for bed and wake-up time.  She was prescribed Ambien, which she reported improved her sleep.  (Tr. at 25.)

The ALJ further noted that plaintiff's orthopedic conditions did not prevent her from ambulating effectively.  The ALJ accepted that plaintiff had pain in her hip even after surgery and that standing for too long or lifting more than she should caused pain in her hip and back.  However, the record did not document physical abnormalities reasonably capable of producing the intractable pain or other symptoms plaintiff alleged.  Most of Dr. Murphy's clinical observations were consistent with the ALJ's findings that plaintiff's depression imposed no more than mild to moderate limitations.  (Tr. at 25.)  Drs. Tagalakis and Laing found no associated instability or radicular symptomatology, normal muscle tone and bulk, and normal strength in the lower extremities.  The MRI performed in July 2010 was essentially negative aside from some scattered degenerative changes most prominent at T11-12.  The only examination performed in January 2012 of the upper extremities showed normal strength throughout (shoulder, elbow, forearm, hand).  At the time of the functional capacity evaluation, plaintiff denied any significant functional limitations in grip strength, pinch, and dexterity, and there was no evidence of ulnar neuropathy or cervical radiculopathy.  The ALJ found no corroborating evidence of repeated diagnoses of severe pain and invasive or burdensome treatment that was ultimately unsuccessful.  The ALJ did not entirely discredit plaintiff's subjective testimony that she spent substantial amounts of time sitting down because of pain, concluding that her medically determinable impairments could reasonably be expected to produce some of her symptoms.  However, the ALJ found that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."

(Tr. at 26.)

In reaching this conclusion, the ALJ noted that plaintiff's daily activities were inconsistent with her complaints of disabling pain. The ALJ further found plaintiff's use of the pain reliever Tramadol only five to six times per week inconsistent with her statements concerning her symptoms. Plaintiff alleged medication side effects, but the record showed that those affects were mild and would not interfere with plaintiff's ability to perform work activities in any significant manner. (Tr. at 26.)

The ALJ noted additional inconsistencies in the record. The limitations the ALJ imposed were consistent with the restrictions plaintiff reported to the agency in her function report, and plaintiff's doctors did not provide restrictions greater than found in the ALJ's RFC. Plaintiff underwent a functional assessment, which reported restrictions less restrictive than found in the ALJ's decision. Plaintiff's activity level was also not as limited as would be expected given her reports of disabling symptoms and limitations. (Tr. at 26.)

Finally, the ALJ considered the reports of the reviewing state agency physician and psychologist. The ALJ imposed additional restrictions but found that these opinions supported the conclusion that plaintiff's impairments did not prevent her from performing all work related activity.[26] (Tr. at 26.)

At step four, the ALJ concluded that plaintiff could no longer perform her past work as a server/waitress, which the VE testified was semi-skilled, light work, as generally performed, medium as plaintiff did it. (Tr. at 27.) Finally, at step five, considering plaintiff's age, education,

---

[26]The ALJ also considered plaintiff's obesity, as required by SSR 02-1p. Plaintiff stood 5'4" tall and weighed between 170 and 187 pounds. The ALJ was unable to conclude that plaintiff's ability to perform routine work movement and necessary physical activity within the work environment was more restrictive than found due to her weight. (Tr. at 26.)

work experience, and RFC, the ALJ found that plaintiff could perform other jobs, as identified by the VE, including assembly, hand packager, and office assistant. (Tr. at 27-28.) The ALJ accordingly found plaintiff not disabled. (Tr. at 28.)

**5.      Appeals Council**

Plaintiff requested review by the Appeal Council (Tr. at 14-15), but on June 25, 2014, the Council denied her request (Tr. at 1), making the ALJ's ruling the final decision of the Commissioner on plaintiff's application. Minnick v. Colvin, 775 F.3d 929, 935 (7th Cir. 2015). This action followed.

## II. DISCUSSION

**A.      Standard of Review**

The court will reverse an ALJ's decision if it not supported by substantial evidence, meaning such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. Although the court may not re-weigh the evidence or substitute its judgment for the ALJ's, this does not mean that the court simply rubber-stamps the decision without a critical review of the evidence. Id. The court considers both the evidence that supports as well as the evidence that detracts from the ALJ's conclusions, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. Scrogham v. Colvin, 765 F.3d 685, 695 (7th Cir. 2014). In addition to relying on substantial evidence, the ALJ must also explain her analysis of the evidence with enough detail and clarity to permit meaningful appellate review. Id.

**B.      Analysis**

Plaintiff argues that the ALJ erred in evaluating (1) her fibromyalgia and chronic fatigue,

(2) her credibility, (3) RFC, and (4) the Listings.  I address each argument in turn.

**1.    Fibromyalgia and Chronic Fatigue**

Plaintiff first agues that the ALJ failed to properly evaluate all pertinent severe impairments at step two,[27] thus impacting her credibility and RFC findings.  Specifically, plaintiff criticizes the ALJ's discussion of fibromyalgia and chronic fatigue.

The ALJ's evaluation of plaintiff's fibromyalgia was flawed.  The ALJ stated that while Dr. Murphy "suspected" this impairment, the treatment records did not reflect the trigger points or muscular pain necessary for a diagnosis.  (Tr. at 25.)  However, during his April 23, 2010 exam, Dr. Murphy found pain and tenderness "over all the fibromyalgia tender points."  (Tr. at 341.)  He made a similar finding on May 7, 2010 (although plaintiff had by that point shown significant improvement on Cymbalta).  (Tr. at 339.)  He continued to diagnose fibromyalgia during subsequent visits (Tr. at 331, 325, 324, 321, 318, 315, 454, 450), and on September 27, 2011, and December 29, 2011, he again found pain and tenderness over most of the tender points on exam (Tr. at 449, 616).  "ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves."  Moon v. Colvin, 763 F.3d 718, 722 (7th Cir. 2014); see also Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").[28]

_____

[27]An impairment is "severe" if it significantly limits the claimant's ability to do basic work activities.  20 C.F.R. § 404.1520(c).

[28]Plaintiff also takes issue with the ALJ's statement that "her pain was controlled with Lyrica" (Tr. at 25), noting that her pain waxed and waned despite medication.  During a February 20, 2012, exam, Dr. Murphy noted that despite "slow, steady progress" plaintiff was "not where I would like her to be quite yet."  (Tr. at 594.)  Regarding plaintiff's chronic fatigue, the ALJ focused on the reports of insomnia, finding "insufficient evidence in the record to

The Commissioner notes that the mere diagnosis of an impairment says nothing about its severity. See Schmidt v. Barnhart, 395 F.3d 737, 745-46 (7th Cir. 2005); see also Estok v. Astrue, 152 F.3d 636, 640 (7th Cir. 1998) ("It is not enough to show that she had received a diagnosis of fibromyalgia . . ., since fibromyalgia is not always (indeed, not usually) disabling."). Further, as both sides recognize and as the Seventh Circuit recently reiterated, the step two severity determination is merely a threshold requirement. Curvin v. Colvin, 778 F.3d 645, 648 (7th Cir. 2015). Even if the ALJ errs in finding certain impairments non-severe at step two, so long as she finds at least one severe impairment and continues with the sequential evaluation, any step two error is harmless if the ALJ properly considers all of the claimant's impairments (severe and non-severe), the objective medical evidence, her symptoms, and her credibility when determining RFC. Id. at 649 (citing Arnett v. Astrue, 676 F.3d 586, 591 (7th Cir. 2012)).

Plaintiff contends that her constant fatigue and chronic pain would impact her ability to work full-time without excessive breaks, absences, or time off task. The Commissioner responds that plaintiff cites no medical evidence supporting any work-related limitations based on fibromyalgia.[29] The Commissioner further notes the ALJ's findings that plaintiff's fibromyalgia and insomnia responded to treatment, that she displayed normal gait and full

_____

establish that [plaintiff's] sleep problems precluded her from working." (Tr. at 25.) The ALJ noted indications in the record that plaintiff's sleep problems were mild, related in part to excessive caffeine intake, and that plaintiff reported improved sleep with prescription Ambien. (Tr. at 25.) Plaintiff contends that in so doing the ALJ overlooked the ongoing notations in the record of "severe," "persistent," and "profound" fatigue (Tr. at 449, 635, 616), which Dr. Murphy believed to be "multi-factorial" (Tr. at 334).

[29]The Commissioner also cites Dr. Murphy's May 2012 treatment note in which he told plaintiff he did not think she could obtain long-term disability based on fibromyalgia. (Tr. at 579.) The ALJ did not rely on this evidence, so the agency may not use it to bolster her decision. Shauger v. Astrue, 675 F.3d 690, 697 (7th Cir. 2012) (citing SEC v. Chenery Corp., 318 U.S. 80, 93-95 (1943)).

strength in the extremities on exam, that no treating or reviewing physician endorsed greater restrictions, and that the functional capacity assessment reported less severe restrictions than set forth in the RFC.  (Tr. at 25-26.)

In reply, plaintiff indicates that once she established a medically determinable impairment that could produce the symptoms she alleged, the ALJ was required to evaluate the subjective complaints based on the entire record.  See SSR 96-7p, 1996 SSR LEXIS 4, at *5-6.  Plaintiff does not contend that fibromyalgia alone rendered her disabled, but rather that the ALJ's flawed analysis of this impairment tainted the credibility evaluation and, consequently, the RFC determination.  Plaintiff reported pain in her arms and legs due to fibromyalgia and testified to significant limitations in walking, standing, and sitting due to pain and chronic fatigue, which would limit her ability to work despite the normal gait and strength shown in the exams.[30]

Because the harmfulness vel non of the step two error requires consideration of the ALJ's credibility and RFC determinations, I proceed to those issues.

## 2. Credibility

In evaluating a claimant's credibility, the ALJ must comply with the requirements of SSR 96-7p.  Giles ex rel. Giles v. Astrue, 483 F.3d 483, 488 (7th Cir. 2007).  That Ruling directs the ALJ to first determine whether the claimant suffers from medically determinable impairments that could reasonably be expected to produce the pain or other symptoms alleged.  If the claimant has no such impairments, the alleged symptoms cannot be found to affect her ability to work.  If an impairment that could reasonably be expected to produce the symptoms has

---

[30]Plaintiff further notes that while it may be desirable to have a treating source report supporting disability, SSA regulations contain no such requirement.

been shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's ability to work. SSR 96-7p, 1996 SSR LEXIS 4, at *5-6. At this step, the ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it. Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009). In some circumstances, pain alone can be disabling, even in the absence of objective medical substantiation. Carradine v. Barnhart, 360 F.3d 751, 753 (7th Cir. 2004). Accordingly, once the claimant produces medical evidence of an underlying impairment, the ALJ must evaluate the claimant's statements based on the entire record, SSR 96-7p, 1996 SSR LEXIS 4, at *6, providing specific reasons for her credibility determination, supported by the evidence in the case record. Id. at *12.

On judicial review, the court gives the ALJ's credibility determination special, but not unlimited, deference. The ALJ must consider the factor set forth in SSR 96-7p, and she must support her findings with evidence in the record. Shauger, 675 F.3d at 696; see also Craft v. Astrue, 539 F.3d 668, 678 (7th Cir. 2008) ("The finding must be supported by the evidence and must be specific enough to enable the claimant and a reviewing body to understand the reasoning.").

In the present case, the ALJ stated:

> [T]he Administrative Law Judge does not entirely discredit [plaintiff's] subjective testimony that she spends substantial amounts of time sitting down because of pain, concluding that [plaintiff's] medically determinable impairments could reasonably be expected to produce some of her symptoms. However, [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. at 26.) This is "meaningless boilerplate seen frequently in decisions from ALJs," Shauger, 675 F.3d at 696, which "backwardly 'implies that the ability to work is determined first and is

41

then used to determine the claimant's credibility.'" Id. (quoting Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012)). "The implication is that the assessment of the claimant's ability to work precedes and may invalidate the claimant's testimony about his or her ability to work. Actually that testimony is properly an input into a determination of ability to work." Browning v. Colvin, 766 F.3d 702, 707 (7th Cir. 2014). "Credibility findings must have support in the record, and hackneyed language seen universally in ALJ decisions adds nothing." Shauger, 675 F.3d at 696.

As the parties recognize, however, if the ALJ has otherwise explained her conclusion adequately, inclusion of the boilerplate may be deemed harmless. Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012). In the present case, the ALJ went on to state:

> In reaching this conclusion, the undersigned notes that [plaintiff's] daily activities are inconsistent with her complaints of disabling pain. Furthermore, [plaintiff's] use of medication does not lead to a finding that she is more limited than found in this decision. The fact that [plaintiff] utilizes pain reliever, Tramadol only 5-6 times a week, is inconsistent with statements concerning the intensity, persistence and limiting effects of her symptoms. [Plaintiff] testified that she experienced adverse side effects from medication. Although [plaintiff] has alleged that she has experienced various side effects from medication, the record indicates that those side effects are mild and would not interfere with [plaintiff's] ability to perform work activities in any significant manner.
> . . .
> There are additional inconsistencies in the record. The limitations found in this decision are consistent with the restrictions [plaintiff] reported to the Administration (Exhibit 3E/13). [Plaintiff's] treating physicians have not provided restrictions or limitations greater than found in this decision. It is emphasized that [plaintiff] underwent a Physical/functional Assessment and the restrictions reported were less restrictive than the limitations found in this decision (Exhibit 13F). [Plaintiff's] activity level is not as limited as would be expected given her reports of disabling symptoms and limitations.

(Tr. at 26.)

This fails to provide the required path of reasoning. The ALJ first relied on plaintiff's daily activities but failed to mention any specific tasks or to explain how any such activities

42

conflicted with plaintiff's claims. The Commissioner notes that the ALJ did list some of plaintiff's activities earlier in the decision at step three. (Tr. at 22.) While I read the ALJ's decision as a whole, see Curvin, 778 F.3d at 650, the ALJ failed to relate any those rather modest activities – walking a small dog short distances, doing light housework, cooking complete meals two to four times per week, and shopping for groceries – to plaintiff's allegations of disabling pain and fatigue. See, e.g., Hughes v. Astrue, 705 F.3d 276, 278 (7th Cir. 2013) ("We have remarked the naiveté of the Social Security Administration's administrative law judges in equating household chores to employment."); Bjornson, 671 F.3d at 647 (noting the critical differences between activities of daily living and activities in a full-time job, and that the "failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases").

The ALJ next found plaintiff's treatment and use of pain medication inconsistent with her allegations.[31] However, this overlooks the references to severe pain in the treatment records (E.g., Tr. at 341, 395, 321, 451); plaintiff's receipt of injections, denervation, and physical therapy to treat her back and hip pain, without lasting relief (E.g. Tr. at 46-47, 389, 342, 395, 320, 403, 405, 407, 410, 418, 450, 448, 447, 547); and her consideration of surgical removal of the symptomatic hardware from her hip (Tr. at 487-88). Plaintiff obtained some relief of her fibromyalgia symptoms from Cymbalta and Lyrica, but side effects (from Cymbalta) and insurance issues (with Lyrica) prevented her from continuing to take those medications. (Tr. at 337-38, 316, 661.) Further, to the extent the ALJ found plaintiff's pain complaints

---

[31]Earlier in the decision, prior to the boilerplate quoted above, the ALJ stated: "[Plaintiff] does not have corroborating evidence of repeated diagnoses of severe pain and invasive or burdensome treatment that was ultimately unsuccessful." (Tr. at 26.)

43

inconsistent with the medical evidence, the ALJ's rejection of the fibromyalgia diagnosis likely affected that determination.[32]  See Sarchet, 78 F.3d at 307 (reversing where the ALJ misunderstood fibromyalgia, its symptoms and treatment); Kurth v. Astrue, 568 F. Supp. 2d 1020, 1032 (W.D. Wis. 2008) (noting that subjective complaints are more important in fibromyalgia cases).  Finally, the ALJ found that the record showed plaintiff's alleged medication side effects were mild, but the ALJ failed to specify what in the record supported that conclusion.  The Commissioner cites a medical record where plaintiff denied side effects (Tr. at 657), but this note concerned plaintiff's Ambien sleep medication, not her other pills; in any event, the argument is post hoc.  See Hanson v. Colvin, 760 F.3d 759, 762 (7th Cir. 2014) (noting that an agency's discretionary decision must be upheld, if at all, on the same basis articulated in the decision).

The "additional inconsistencies" noted by the ALJ present a closer call.  It is true that plaintiff estimated greater sitting and standing abilities in her initial function report filed with the agency in July 2011 (Tr. at 180) than she did in her testimony at the hearing in April 2013 (Tr. at 50).  However, nearly two years separated these statements, and the ALJ failed to consider whether plaintiff's condition deteriorated in the interim.  It is also true that the January 2012 FCE found plaintiff capable of light work,[33] and that plaintiff's doctors provided no restrictions

---

[32]For instance, the ALJ stated that "the record does not document physical abnormalities reasonably capable of producing the intractable pain or other symptoms alleged by [plaintiff]." (Tr. at 25.)  Had the ALJ accepted the fibromyalgia diagnosis, she may have come to a different conclusion.

[33]At the January 2012 FCE, plaintiff denied grip, pinch, or dexterity limitations (Tr. at 26, 538-39), yet she claimed significant problems with her hands at the April 2013 hearing (Tr. at 55).  However, it appears that plaintiff's hand pain manifested in September 2012 (see Tr. at 577), between the FCE and the hearing.

greater than found in the ALJ's RFC. While this evidence may have undercut plaintiff's credibility, the ALJ did not explain how this was so, see Faust v. Colvin, 13-cv-323, 2014 U.S. Dist. LEXIS 13136, at *4-5 (W.D. Wis. Jan. 31, 2014) (reversing where the ALJ cited various pieces of evidence but never explained specifically how or even whether those observations undermined the claimant's credibility), and the other errors discussed above convince me that the matter must be remanded for reconsideration of plaintiff's credibility.

**3.    RFC/Hypothetical Question**

In determining RFC, the ALJ must consider all limitations that arise from medically determinable impairments, even those that are not severe. Villano, 556 F.3d at 563. If the ALJ relies on vocational testimony, she is also required to orient the VE to the totality of a claimant's limitations. "Among the limitations the VE must consider are deficiencies of concentration, persistence and pace." O'Connor-Spinner v. Astrue, 627 F.3d 614, 619 (7th Cir. 2010).

In the present case, the ALJ found "moderate" limitations in concentration, persistence, and pace (Tr. at 23), but the only mental restriction included in the RFC was for "simple, routine and repetitive work tasks." (Tr. at 24.) The Seventh Circuit has "repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." Yurt v. Colvin, 758 F.3d 850, 858-59 (7th Cir. 2014); accord Stewart v. Astrue, 561 F.3d 769, 684-85 (7th Cir. 2009). This is so because the "ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." O'Connor-Spinner, 627 F.3d at 620.

It is true that the Seventh Circuit has not adopted a per se rule that this specific terminology – "concentration, persistence, and pace" – must be used in the hypothetical in all

45

cases.  Id. at 619.  For instance, in some cases the VE may learn of the claimant's limitations by independently reviewing the record or listening to the testimony.  The ALJ may also employ "alternative phrasing" specifically excluding those tasks that someone with the claimant's limitations would be unable to perform.  Id.  "In most cases, however, employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace."  Id. at 620.

The Commissioner urges the court to exercise the flexibility granted by O'Connor-Spinner because in that case (and the others cited above) the ALJ relied on medical evidence that the claimant indeed had significant problems of concentration, persistence, and pace.  The Commissioner indicates that in this case no medical evidence supports such limitations, which the ALJ adopted based on plaintiff's subjective complaints.[34]  However, the RFC:

> assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.

SSR 96-5p, 1996 SSR LEXIS 2, at *12 (emphasis added).  The Commissioner cites no authority supporting the proposition that limitations based on the claimant's statements, as opposed to medical evidence, may be omitted from the hypothetical.[35]  The matter must be remanded so the ALJ may account for limitations in concentration, persistence, and pace.

---

[34]I note that PA King attributed plaintiff's memory problems to "underlying affective disorder, with and without fibromyalgia."  (Tr. at 581, 575.)

[35]The Commissioner concedes that none of the exceptions specifically discussed in O'Connor-Spinner apply here.

On remand, the ALJ must also consider whether any further limitations related to plaintiff's fibromyalgia and chronic fatigue need to be included in the RFC. Specifically, the ALJ should consider whether plaintiff's pain and fatigue impact her ability to maintain full-time work with acceptable pace and productivity.

### 4.    Listings

Finally, plaintiff argues that the ALJ failed to sufficiently discuss the Listings. The ALJ found that none of plaintiff's impairments met or equaled a Listing, including those cited in Section 1.00 et seq (musculoskeletal system), 1.02 (dysfunction of a joint), 1.03 (reconstructive surgery or surgical arthrodesis of a major weight-bearing joint), 1.04 (disorders of the spine), and 12.04 (affective disorders). (Tr. at 22.) However, the ALJ specifically discussed only Listing 12.04.

"In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004). Plaintiff faults the ALJ for merely referencing the Listings related to her physical impairments by number, with no analysis. However, plaintiff does not even attempt to show that she meets or equals any particular Listing,[36] making any error by the ALJ in failing to say more harmless. See, e.g., Olson v. Astrue, No. 13-C-0929, 2014 U.S. Dist. LEXIS 61843, at *51(E.D. Wis. May 5, 2014) (citing Prochaska v. Barnhart, 454 F.3d 731, 736 (7th Cir. 2004); Ramos v. Astrue, 674 F. Supp. 2d

---

[36] See Ribaudo v. Barnhart, 458 F.3d 580, 583 (7th Cir. 2006) ("Ribaudo has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing.") (citing Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999)).

1076, 1092 (E.D. Wis. 2009)); see also Rice v. Barnhart, 384 F.3d 363, 369-70 (7th Cir. 2004) (declining to reverse based on ALJ's failure to explicitly refer to relevant Listing, where the evidence was insufficient to show that the claimant satisfied the criteria).

Plaintiff also faults the ALJ for failing to consider obesity at step three, but she again fails to point to any specific evidence that her obesity, alone or in combination with other impairments, should result in a finding of medical equivalence under the Listings.[37]  See Prochaska, 454 F.3d at 737-37 (citing Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004)). Nor does plaintiff make any showing that her fibromyalgia, alone or in combination with other impairments, medically equals a Listing.  I therefore cannot find reversible error on this point.

### III.  CONCLUSION

For the reasons stated,

**IT IS ORDERED** that the ALJ's decision is **REVERSED**, and the case is **REMANDED** for further proceedings consistent with this decision.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 20th day of April, 2015.

/s Lynn Adelman
LYNN ADELMAN
District Judge

---

[37]The ALJ did consider plaintiff's obesity in determining RFC.  (Tr. at 26.)